UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| ) | No. 19 CR 922 |
| v. ) | |
| ) | Judge Sara L. Ellis |
| TYJUAN LIGHTHALL, ) | |
| ) | |
| Defendant. ) | |

**OPINION AND ORDER**

On January 17, 2019, Evanston Police Department ("Evanston PD") detectives conducted a traffic stop of a car in which Defendant Tyjuan Lighthall was a passenger. The detectives recovered a firearm from under the front passenger seat in which Lighthall had been sitting. On December 10, 2019, the government charged Lighthall with possessing a firearm as a felon, in violation of 18 U.S.C. § 922(g)(1). Lighthall now moves to suppress the firearm as the fruit of his unlawful seizure. Because the driver committed a traffic violation, the seizure of the car was lawful, and the Court denies Lighthall's motion.

**BACKGROUND**[1]

On January 17, 2019 around 4:00 p.m., Marlon Scott was driving a black Nissan sedan with tinted windows in the Rogers Park neighborhood of Chicago, Illinois. Scott testified that he picked up four friends from the Howard Red Line stop, including Lighthall, and was planning to drive them each home. Scott was not certain where Lighthall was sitting in the car, but camera footage confirms that Lighthall was sitting in the front passenger seat. (Rosenbaum BWC at 1:45) Scott testified that after leaving the train station, he drove through the Jewel Osco parking

---

[1] The facts in the background section are taken from the parties' briefs and the exhibits attached thereto, including dash and body-worn camera ("BWC") footage, and the evidentiary hearings held on October 22, 2021 and November 8, 2021. Evanston PD Detective Daniel Rosenbaum testified on October 22, 2021, and Marlon Scott testified on November 8, 2021.

lot located at 1763 West Howard Street in Chicago. As Scott was driving out of the parking lot, taking a left turn, heading south, onto Clark Street, he saw detectives in a car across the street, waiting to turn left, heading north, onto Clark. This took place at the intersection of West Birchwood Avenue and Clark Street, which has a traffic light. Scott said that he made eye contact with the detective who was driving and then the detective changed his turn signal to indicate he was turning south onto Clark, in the same direction as Scott. Scott testified that he tried to let the detective turn before him but that the detective insisted Scott turn first. Scott ultimately turned south onto Clark first and the detective followed shortly after. Lighthall attested that Scott turned left, heading north, on Clark when the group saw an unmarked police car waiting to turn south onto Clark. Lighthall asserted that the police car then made a U-turn to follow Scott's car. Scott first testified that the group was heading to the Walgreens located at 7410 North Clark Street because he needed to go there but then later testified that he could not recall why they were going to Walgreens or why they were in the Jewel Osco parking lot. Lighthall attested that the group was going to Walgreens to buy eyelashes for his girlfriend.

Evanston PD Detective Daniel Rosenbaum testified that on January 17, 2019, he was on patrol in the area in an unmarked police car with Detectives Pauline Pogorzelski and Kyle Wideman. Rosenbaum was driving and noticed a black Nissan sedan with tinted windows idling on Paulina Street near the Howard Red Line stop. Rosenbaum continued his patrol and shortly after, parked his car near the intersection of West Birchwood Avenue and Clark Street, facing east. While parked there, Rosenbaum saw a dark-colored Nissan with tinted windows leaving the Jewel Osco parking lot and turning southbound on Clark. Rosenbaum testified that the car caught his attention because the back window was down and he could see multiple passengers in the backseat moving around. He could not confirm this was the same Nissan he saw idling on

Paulina Street earlier. Rosenbaum testified that he turned southbound on Clark to follow the Nissan, traveling about one to one and a half city blocks behind the car. Rosenbaum testified that he had a direct view of the back of the Nissan while traveling behind it. At approximately 4:10 p.m., Scott turned into the Walgreens parking lot and parked in a parking spot. (Dash Cam at 0:03) Scott testified that immediately after he turned south onto Clark towards the Walgreens, he activated his turn signal and then turned right into the Walgreens parking lot. Lighthall also attested that Scott activated his turn signal when making a right turn into the Walgreens parking lot. Rosenbaum testified that he observed Scott's brake lights activate when he turned into the parking lot but never observed a turn signal activate. When enlarged, dash-camera footage from Rosenbaum's police car indicates that Scott did not activate his turn signal. (Dash Cam at 0:02; Doc. 77, Gov. Ex. 4G, 4H).

Seconds later, Rosenbaum activated his emergency lights and approached the Nissan from behind. (Dash Cam at 0:30) The officers immediately got out of their car and surrounded the Nissan: Rosenbaum approached the driver's window, Wideman approached the driver's side rear window, and Pogorzelski approached the rear passenger side window. (Dash Cam at 0:39) As Rosenbaum reached the Nissan, he knocked on the side of the car and Scott opened his car door. (Dash Cam at 0:41) Rosenbaum asked Scott to roll down the back window and once Scott had done so, Rosenbaum told Scott that he pulled the Nissan over because Scott did not use a turn signal when entering the parking lot and because he had "heavy tint on the car." (Rosenbaum BWC at 0:35) Scott responded that he did use a turn signal when entering the parking lot and that his tints were at thirty-five percent, which Scott contended was legal. (Rosenbaum BWC at 0:54) Rosenbaum then asked for Scott's license and for identification from each passenger. (Rosenbaum BWC at 1:05, 1:45) As the officers wrote down the back

passengers' names, Rosenbaum asked if there was anything in the car that they should not have and Scott said no. (Rosenbaum BWC at 2:24) Rosenbaum then asked Scott, "Was that you guys who were pulled up on Paulina earlier? By the train station?" (Rosenbaum BWC at 2:44) Scott replied, "No." (Rosenbaum BWC at 2:50)

Approximately three minutes after approaching the car, the officers told the Nissan's occupants to step out of the car and then searched each of them. (Wideman BWC at 3:00) Rosenbaum testified that the officers smelled the odor of cannabis coming from the car and believed they would find cannabis secreted somewhere in the car. Specifically, Rosenbaum testified that as soon as Scott opened the car door to speak to him, while he stood about three to four feet from the car, he smelled the odor of fresh cannabis coming from the passenger compartment of the Nissan. While Wideman searched one of the backseat passengers, Rosenbaum asked if there were any firearms in the car and Scott replied, "I don't have anything in the car. My car—don't smoke in my car. Cigarettes is what you smell." (Rosenbaum BWC at 3:45) At the time, Lighthall was smoking a cigarette. (Rosenbaum BWC at 4:48)

As Wideman searched the next backseat passenger, the passenger admitted that he had a small bag of cannabis in his pocket. (Wideman BWC at 5:05, 5:55) Rosenbaum again asked Scott if there was anything in the car and Scott again said no. (Rosenbaum BWC at 5:00) Rosenbaum said, "We're not gonna trip over a little bag or nothing." (Rosenbaum BWC at 5:03) Scott again replied, "I don't smoke in my car, so I know my car don't smell like." (Rosenbaum BWC at 5:06) Rosenbaum interrupted him and said, "I'm not really concerned about you. This guy's [pointing at Lighthall] doing a little bit of this." (Rosenbaum BWC at 5:09) Rosenbaum testified that Lighthall's hands were shaking as he manipulated his cigarette, which Rosenbaum interpreted as a sign of excessive nervousness. In response, Lighthall assured Rosenbaum that he

4

was alright (Rosenbaum BWC at 5:13) and Scott again assured Rosenbaum there was nothing in the car, saying, "I know my car don't smell like anything. I know I turned my turn signal on." (Rosenbaum BWC at 5:25) After a couple minutes of searching the female passenger, Pogorzelski asked, "Where is the weed? Cause I can smell it on you." (Pogorzelski BWC at 9:56) Rosenbaum testified that the officers found a small bag of cannabis on the female passenger as well.

Once the officers had searched each of the occupants of the Nissan, Wideman began searching the car. (Wideman BWC at 9:05) He used a flashlight to look inside the center console, around the interior of the car, and under the seats. (Wideman BWC at 9:25) After about three minutes of searching, Wideman discovered a firearm under the front passenger seat where Lighthall had been sitting. (Wideman BWC at 12:03; Pogorzelski BWC at 21:13) The offiecrs then placed all of the occupants in handcuffs. (Wideman BWC at 12:12) After all of the occupants arrived at the police station, Pogorzelski and Wideman continued searching the car. (Pogorzelski BWC at 37:00) While searching the backseat, Pogorzelski noted that it "smell[ed] like fresh weed" and a forensic officer in the front seat responded, "Yea, it does. I can smell it." (Pogorzelski BWC at 43:40) Pogorzelski later uncovered 13 grams of cannabis in a backpack in the trunk of the Nissan (Pogorzelski BWC at 44:44) and officers at the police station also recovered 13 grams of cannabis hidden in Scott's buttocks. While testifying, Scott could not recall placing cannabis in his buttocks on that day but acknowledged he had done it twice before. Scott also did not recall having cannabis in the trunk of his car and testified that he did not know a firearm was under the front passenger seat. At the police station, officers read Lighthall his *Miranda* rights and Lighthall then admitted that the firearm belonged to him. Rosenbaum cited Scott for failing to use a turn signal in violation of 625 Ill. Comp. Stat. 5/11-804.

## ANALYSIS

Lighthall argues that the traffic stop was unlawful because Scott did not commit a traffic violation and therefore, the Court must suppress the firearm discovered during the stop.[2] The Fourth Amendment affords individuals the right to "be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. A brief detention to investigate a traffic violation constitutes a seizure of all the car's occupants under the Fourth Amendment and therefore, the detention must be reasonable. *Whren v. United States*, 517 U.S. 806, 809–10 (1996); *Wilbourn*, 799 F.3d at 908. "If an officer reasonably thinks he sees a driver commit a traffic violation, that is sufficient grounds to pull him over without offending the Constitution." *United States v. Lewis*, 920 F. 3d 483, 489 (7th Cir. 2019) (citations omitted). The officer need not also have "cause to believe any occupant of the vehicle is involved in criminal activity." *United States v. Chang*, 999 F.3d 1059, 1067 (7th Cir. 2021).

Prior to making a turn, Illinois law requires drivers to activate their turn signal "continuously during not less than the last 100 feet traveled by the vehicle." 625 Ill. Comp. Stat. 5/11-804(b). Lighthall asserted that Scott did activate his turn signal to enter the Walgreens parking lot, while the government argues that Scott did not. Because the dash camera footage is not dispositive, the validity of the stop primarily depends on the Court's assessment of the

---

[2] To challenge evidence obtained through an unlawful search of a car, Lighthall "must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable." *Minnesota v. Carter*, 525 U.S. 83, 83 (1998). Therefore, for Lighthall to have standing to challenge the search of the Nissan, he must show that he had a legitimate property or possessory interest in the car. *See United States v. Walker*, 237 F.3d 845, 849 (7th Cir. 2001). Because Lighthall does not contend that he has an adequate possessory interest in the Nissan, his challenge of the search depends on the validity of the initial traffic stop. *See United States v. Wilbourn*, 799 F.3d 900, 908 (7th Cir. 2015) ("[B]ecause [defendant] was a passenger with no possessory interest in the car, he must demonstrate that the stop itself was not justified and that the evidence obtained was derived from an illegal stop."). Lighthall initially argued in his briefs that the detectives unlawfully prolonged the traffic stop without the requisite reasonable suspicion. But at the conclusion of the evidentiary hearings, Lighthall only argued that the traffic stop was unlawful because Scott did not commit a traffic violation. Therefore, the Court only addresses this argument.

credibility of the witnesses. *See United States v. Wendt*, 465 F.3d 814, 817 (7th Cir. 2006) (noting the trial judge "has the best 'opportunity to observe the verbal and nonverbal behavior of the witnesses focusing on the subject's reactions and responses to the interrogatories, their facial expressions, attitudes, tone of voice, eye contact, posture and body movements'" (citation omitted)). The Court finds Rosenbaum's testimony more credible than Scott's testimony and Lighthall's affidavit and therefore, credits Rosenbaum's testimony that he observed Scott fail to activate his turn signal.

First, the video footage reveals that Rosenbaum told Scott almost immediately that he pulled Scott over because Scott failed to use a turn signal. Rosenbaum also cited Scott for failing to use his turn signal. That is consistent with what one would expect an officer to do after witnessing a car turn without activating its turn signal.

Second, when enlarged, the dash camera footage supports that Scott did not use a turn signal. Lighthall argues that the footage only reveals two illuminated lights on the rear of the Nissan that appear white instead of red as one would expect brake lights to appear and therefore, the Court cannot rely on the footage. However, notwithstanding the color of the lights, the footage does not show any blinking lights that would be indicative of a turn signal. The Court recognizes that the enlarged dash camera footage is not an accurate depiction of Rosenbaum's vantage point from the driver's seat, but Rosenbaum testified that he had a clear view of the back of the Nissan as Scott turned and that he observed the brake lights illuminate but did not observe a turn signal. This is consistent with what the footage depicts and therefore bolsters Rosenbaum's credibility. *See United States v. Moore*, No. 07-CR-19, 2008 WL 348770, at *9 (N.D. Ind. Feb. 7, 2008) (crediting detective's testimony in part because dash camera footage

7

supported it despite "imperfect lighting on the video necessarily obscur[ing] to some degree what Detective [] may have been able to see").

Third, the Court does not find Scott's testimony credible. Lighthall argues that because Scott knew the officers were following him, he clearly remembered activating his turn signal because he did not want the officers to pull him over, and therefore, his testimony regarding the turn signal is credible. However, activating his turn signal is virtually the only thing Scott clearly remembered from that day— during his testimony, he did not remember that he had cannabis hidden in his buttocks or his trunk, who sat next to him in the car, or why the group went to Jewel Osco or Walgreens. The Court does not find it credible that Scott would specifically remember multiple discrete details about activating his turn signal but would not remember general details about the day or that he had an unlawful substance secreted in his buttocks when detectives arrested him. *See United States v. McBride*, No. 06-CR-71, 2006 WL 1993553, at *3 (E.D. Wis. July 14, 2006) (finding defendant's testimony not credible in part because of his "bald denial that he had broken the law" and inability to recall key details); *Moore*, 2008 WL 348770, at *6–7 (finding detective's testimony regarding whether driver committed traffic violation more credible in part because detective had "every incentive to be truthful" and the driver had "every incentive to claim that he was not speeding even though he was").

Finally, the Court does not find Lighthall's affidavit credible because it contains multiple inconsistencies. Lighthall attested that Scott turned left to head north onto Clark and then turned right into the Walgreens parking lot. However, given the location of the Walgreens, this is not possible—a car driving north on Clark would have to turn left into the Walgreens parking lot. Lighthall also attested that the police car did a U-turn to follow the Nissan, but both Scott and

8

Rosenbaum testified that the police car made a right turn to follow the Nissan. Lighthall further asserted that in the Walgreens parking lot, the officers asked Scott for consent to search the Nissan and stated that they "didn't smell any weed or anything." Doc. 59-1 at 2. However, neither of these statements are audible on the BWC footage and Pogorzelski's two statements indicating that she did smell cannabis, which are audible on the BWC footage, cast doubt on Lighthall's assertion that officers said they did not smell cannabis.

Lighthall argues that Rosenbaum was not credible because at first, he did not recall that Lighthall was smoking a cigarette during the encounter but once the BWC footage refreshed his memory, he recalled that Lighthall's hands were shaking while he held the cigarette. Lighthall argues that this indicates that Rosenbaum's entire testimony was not truthful, but the Court does not agree. This one inconsistency, which is immaterial to whether Scott used a turn signal, does not discredit the remainder of Rosenbaum's testimony. *See United States v. Simon*, 937 F.3d 820, 829 (7th Cir. 2019) (upholding district judge's determination that officer's mistake regarding the location of a stop sign "does not weigh heavily against her credibility because the detail 'is not greatly important regarding the traffic offense for which Defendant was pulled over' and because '[i]t would not have factored in to [sic] determining whether or not to issue Defendant a ticket'" (alteration in original) (citation omitted)). Throughout his testimony, Rosenbaum was honest in admitting he did not recall specific details or could not be certain of something. For example, Rosenbaum could not recall the amount of cannabis that the officers recovered from the passengers of the Nissan and acknowledged that he could not confirm that the black Nissan he observed idling on Paulina Street was the same Nissan he saw driving out of the Jewel Osco parking lot. The fact that Rosenbaum willingly acknowledged facts he could not recall or confirm supports the Court's finding that his testimony is credible. *See United States v.*

*Abernathy*, 258 F. App'x 903, 905 (7th Cir. 2007) (upholding district judge's determination that officer was credible in part because he "was 'candid, non-evasive, and apologetic' when addressing [] inconsistencies"); *United States v. French*, 291 F.3d 945, 951 (7th Cir. 2002) (noting that the Court is free to make determinations of credibility based on each of a witness' "reactions and responses to the interrogatories, their facial expressions, attitudes, tone of voice, eye contact, posture and body movements, as well as confused or nervous speech patterns" (citation omitted)).

Therefore, after observing the demeanor of the witnesses while testifying and considering all of the evidence before it, the Court finds that Rosenbaum observed Scott turn into the Walgreens parking lot without activating a turn signal. As a result, Rosenbaum reasonably believed Scott violated 625 Ill. Comp. Stat. 5/11-804(b) and thus, his seizure of the Nissan, and subsequently Lighthall, was lawful. *See, e.g.*, *United States v. Jackson*, 962 F.3d 353, 357 (7th Cir. 2020) (affirming validity of traffic stop because district court validly credited officer's testimony that she pulled over driver because she reasonably suspected the driver violated the traffic code by having an air freshener that might obstruct his view); *Simon*, 937 F.3d at 829–31 (upholding district court's credibility determination regarding officers' testimony that they observed defendant fail to activate his turn signal and finding the traffic stop lawful); *United States v. Miller*, No. 03-180-CR-01, 2005 WL 756160, at *12 (S.D. Ind. Jan. 21, 2005) (crediting officer's testimony over defendant's and finding "testimony by [the officer] that it appeared to him that no turn signal was made [was] enough to justify the stop"). Because Lighthall's seizure was lawful, he cannot contest the recovery of the firearm. *See Wilbourn*, 799 F.3d at 908 ("[B]ecause [defendant] was a passenger with no possessory interest in the car, he must

demonstrate that the stop itself was not justified and that the evidence obtained was derived from an illegal stop.").

## CONCLUSION

For the foregoing reasons, the Court denies Lighthall's motion to suppress [55].

Dated: November 22, 2021

SARA L. ELLIS
United States District Judge